# EXHIBIT H

# EXHIBIT H

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
 )            CDC Number C-20149
ARTEMIO ARROYO )
 )
 )            **INMATE**
——————————————————— )
            **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 12, 2005

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner

OTHERS PRESENT:

Mr. Tom Sawyer, Commissioner
Mr. Artemio Arroyo, Inmate
Ms. Pat Fox, Attorney for Inmate
Mr. Jose Zavala, Interpreter
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

———————     No        See Review of Hearing
———————     Yes       Transcript Memorandum

Kristin Ledbetter, Peters Shorthand Reporting

Exhibit  H

ii

## INDEX

|                          | PAGE |
|--------------------------|------|
| Proceedings ........................................ | 1  |
| Case Factors ....................................... | 11 |
| Pre-Commitment Factors ............................. | 25 |
| Post-Commitment Factors ............................ | 40 |
| Parole Plans ....................................... | 33 |
| Closing Statements ................................. | 56 |
| Recess ............................................. | 58 |
| Decision ........................................... | 59 |
| Adjournment ........................................ | 66 |
| Transcriber Certification .......................... | 67 |

--oOo--

Exhibit H

1

1        P R O C E E D I N G S

2        PRESIDING COMMISSIONER FISHER:  Okay.

3   (indiscernible) do you swear or affirm that the

4   interpretation that you give at this hearing

5   will be the truth and nothing but the truth

6   (indiscernible)?

7        INTERPRETER ZAVALA:  I do.

8        PRESIDING COMMISSIONER FISHER:  All

9   right.  This is going to be a Subsequent Parole

10  Consideration Hearing for Artemio.

11       INMATE ARROYO:  Artemio.

12       PRESIDING COMMISSIONER FISHER:  Arroyo?

13       INMATE ARROYO:    Yes.

14       PRESIDING COMMISSIONER FISHER:  CDC

15  number C-20149.  Today's date is 4/12/05, I'm

16  sorry, 7/12/05, and we're located at the

17  Correctional Training Facility in Soledad.  The

18  inmate was received on 8/20 (indiscernible) --

19       DEPUTY COMMISSIONER MEJIA:  One of my

20  tapes is out.

21       PRESIDING COMMISSIONER FISHER:  Okay.

22            [Off the record]

23       DEPUTY COMMISSIONER MEJIA:  Okay.  We're

24  back on record.

25       PRESIDING COMMISSIONER FISHER:  All

26  right.  Thank you.  All right.  The life term

27  begins on 8/20/80, and the minimum eligible

Exhibit H 1

2

1    parole date is 8/30/89.  The controlling offense

2    for which the inmate has been committed is

3    second-degree murder, Case Number 30688, Count

4    One, Penal Code Section 187.  The inmate

5    received a term of 15 years to life.  Once

6    again, the minimum eligible parole date is

7    8/30/89.  Mr. Arroyo, we're going to be tape-

8    recording today, so for purpose of voice-

9    identification for the transcriber, we're each

10   going to say our first and last name and spell

11   our last name.  When I get to you, I need your

12   CDC number.  All right.  I'm going to start with

13   myself and go to my left, Susan Fisher,

14   F-I-S-H-E-R, Commissioner.

15        **COMMISSIONER SAWYER:**  Tom Sawyer,

16   S-A-W-Y-E-R, Commissioner.

17        **DEPUTY COMMISSIONER MEJIA:**  Rolando

18   Mejia, M-E-J-I-A, Deputy Commissioner.

19        **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney

20   for Mr. Arroyo.

21        **INMATE ARROYO:**  Artemio Arroyo,

22   C-20149.

23        **ATTORNEY FOX:**  And spell your last name.

24        **INMATE ARROYO:**  Okay.  A-R-R-O-Y-O.

25        **ATTORNEY FOX:**  Thank you.

26        **INTERPRETER ZAVALA:**  Jose Zavala,

27   Z-A-V-A-L-A, Spanish interpreter.

*Exhibit H 2*

3

1        PRESIDING COMMISSIONER FISHER:  Okay.

2  Thank you.  And I'd like to also note for the

3  record that we have two correctional officers

4  present who are here for security purposes and

5  will not be participating in the hearing.  Mr.

6  Arroyo, before we can get going here, let me

7  just double check with you.  I need to know how

8  you want to use the Mr. Zavala today.  Do you

9  want him to give you assistance occasionally if

10  you need help expressing yourself or help with

11  something one of says?  Is that the way we're

12  going to work?

13        INMATE ARROYO:  Yes.  Yes.

14        PRESIDING COMMISSIONER FISHER:  Okay.

15  All right.  Do you read English?

16        INMATE ARROYO:  Yes.

17        PRESIDING COMMISSIONER FISHER:  You have

18  a (indiscernible).

19        INMATE ARROYO:  Yes.

20        PRESIDING COMMISSIONER FISHER:  I need to

21  ask you to read that Americans with Disabilities

22  Act.  It's there on the table in front of you,

23  if you would just read it out loud for us,

24  please into the record.

25        INMATE ARROYO:  See if I can see because

26  I don't have my glasses.

27        PRESIDING COMMISSIONER FISHER:  You don't

*Exhibit H 3*

4

1   have your glasses?  Okay.  You know what.  I can

2   read it to you if you'd like.

3          **INMATE ARROYO:**  Yes.

4          **DEPUTY COMMISSIONER MEJIA:**  We also have

5   a magnifying lens.

6          **PRESIDING COMMISSIONER FISHER:**  I can

7   read it for the record.  It's no problem.

8          **ATTORNEY FOX:**  That would be a reasonable

9   accommodation, I think.

10         **PRESIDING COMMISSIONER FISHER:**

11         All right.  "The Americans with

12         Disabilities Act is a law to help

13         people with disabilities.

14         Disabilities are problems that

15         make it harder for some people to

16         see, hear, breathe, talk, walk,

17         learn, think, work, or take care

18         of themselves than it is for

19         others.  Nobody can be kept out of

20         public places or activities

21         because of a disability.  If you

22         have a disability, you have the

23         right to ask for help to get ready

24         for your BPT Hearing, get to the

25         hearing, talk, read forms and

26         papers, and understand the hearing

27         process.  BPT will look at what

*Exhibit H 4*

5

```
 1          you ask for to make sure that you
 2          have a disability that is covered
 3          by the ADA and that you have asked
 4          for the right kind of help.  If
 5          you do not get help or if you
 6          don't think you got the kind of
 7          help you need, ask for a BPT 1074
 8          Grievance Form.  You can also get
 9          help to fill it out."
10   Did you understand that?
11          INMATE ARROYO:  Yes.
12          PRESIDING COMMISSIONER FISHER:  All
13   right.  I do want to note for the record that
14   Mr. Arroyo did sign a BPT 1073 Form on October
15   15th of 2004, stating that he has no
16   disabilities.  I have some questions to ask you
17   though before we can go any farther.  Okay.
18          INMATE ARROYO:  Okay.
19          PRESIDING COMMISSIONER FISHER:  Do you
20   have any problems walking up and down stairs or
21   walking distances?
22          INMATE ARROYO:  No.
23          PRESIDING COMMISSIONER FISHER:  Okay.
24   And you already said you normally use reading
25   glasses, right?
26          INMATE ARROYO:  Yes.
27          PRESIDING COMMISSIONER FISHER:  Okay.
```

Exhibit H 5

6

1    Did you do a review on your file before you came

2    to your hearing?

3          INMATE ARROYO:  Yes.

4          PRESIDING COMMISSIONER FISHER:  And did

5    you have your glasses available?

6          INMATE ARROYO:  Yes.

7          PRESIDING COMMISSIONER FISHER:  Okay.  Do

8    you have any hearing problems?

9          INMATE ARROYO:  No.

10         PRESIDING COMMISSIONER FISHER:  Okay.

11   And prior to coming to prison, how far did you

12   get in school?

13         INMATE ARROYO:  Nine grade.

14         PRESIDING COMMISSIONER FISHER:  While

15   you've been in prison, have you been included in

16   the Mental Health Programs, Triple CMS or EOP

17   Programs?

18         INMATE ARROYO:  Been in different

19   programs that I completed.

20         PRESIDING COMMISSIONER FISHER:  Okay.

21   This is the Mental Health Programs where you,

22   where you're perhaps on medication.

23         INMATE ARROYO:  No.

24         PRESIDING COMMISSIONER FISHER:  Any of

25   those?

26         INMATE ARROYO:  No, I haven't.

27         PRESIDING COMMISSIONER FISHER:  All

*Exhibit H 6*

7

1   right.   Is there any disability that you have

2   that you believe would prevent you from being

3   able to participate in today's hearing?

4          INMATE ARROYO:   No.

5          PRESIDING COMMISSIONER FISHER:   Okay.

6   Good.   Thank you.   All right.   This hearing is

7   being conducted pursuant to Penal Code Sections

8   3041 and 3042 and the rules and regulations of

9   the Board of Prison Terms that govern parole

10  consideration hearings for life inmates.   And as

11  I'm sure you know, Mr. Arroyo, the purpose of

12  the hearing today is to consider your

13  commitment, your prior criminal and social

14  history, and your behavior and programming since

15  you've been in prison for this offense.   We've

16  had the opportunity to review your files, and

17  we're going to give you the opportunity to make

18  any corrections that you need to today.   All

19  right.

20         INMATE ARROYO:   Right.

21         PRESIDING COMMISSIONER FISHER:   We're

22  going to be reaching a decision today as to

23  whether or not we find you suitable for parole.

24  If we do find you suitable, I'm going to explain

25  to you how much (indiscernible).   Now, before we

26  recess and deliberate, I'm going to give you and

27  your attorney the opportunity to make a final

*Exhibit H 7*

8

1  statement about your suitability.  I want to

2  remind you that you're not required to admit or

3  discuss your offense today, but the Panel does

4  accepts the findings of the Court to be true.

5  Do you understand that?

6          INMATE ARROYO:  Yes.

7          PRESIDING COMMISSIONER FISHER:  Okay.

8  The California Code of Regulations states that

9  regardless of time served a life inmate shall be

10  found unsuitable for and denied parole if in the

11  judgment of the Panel he would pose an

12  unreasonable risk of danger to society if

13  released from prison.  You have rights that are

14  related to this hearing.  They include the right

15  to a timely notice of the hearing, the right to

16  review your Central File, and the right to

17  present relevant documents.  Ms. Fox, have your

18  client's rights been met?

19          ATTORNEY FOX:  Yes.  As to this hearing.

20          PRESIDING COMMISSIONER FISHER:  All

21  right.  You have the right, Mr. Arroyo, to an

22  impartial Panel, and I want to clarify for you

23  that Commissioner Mejia is down there with the

24  file.

25          INMATE ARROYO:  Okay.

26          PRESIDING COMMISSIONER FISHER:  And I

27  will be your Panel.  Commissioner Sawyer is just

*Exhibit H 8*

9

1    here to observe today.  So having seen your two

2    Commissioners today, do you have any objections

3    to the Panel?

4          INMATE ARROYO:  No.

5          PRESIDING COMMISSIONER FISHER:  Okay.

6    Counsel, any objections?

7          ATTORNEY FOX:  No, no objections.

8          PRESIDING COMMISSIONER FISHER:  I'm going

9    to give you a written copy of our decision

10    today.  It's going to be a tentative decision,

11    and that decision will be effective within 120

12    days, and then a copy of the decision and a copy

13    of the transcript of your hearing will be sent

14    to you.  All right.

15          INMATE ARROYO:  Okay.

16          PRESIDING COMMISSIONER FISHER:  Now, at

17    the end of last year they changed the way that

18    you appeal Board decisions, and now, all appeals

19    of Board decisions go directly to the Courts.

20    So if you need information about that, your

21    correctional counselor should have it, and it

22    should also be in the prison law library.

23    Commissioner, would you (indiscernible)?

24    (Indiscernible.)

25          INMATE ARROYO:  Okay.

26          ATTORNEY FOX:  Yes.  I do have the

27    documents, and we have some to submit toward

*Exhibit H 9*

10

1  parole plans, and I'll (indiscernible) and

2  photographs.

3          PRESIDING COMMISSIONER FISHER:  Okay.

4          ATTORNEY FOX:  Thank you.

5          PRESIDING COMMISSIONER FISHER:  All

6  right.  Counsel, are there any preliminary

7  objections?

8          ATTORNEY FOX:  No, we have none.

9          PRESIDING COMMISSIONER FISHER:  All

10  right.  Is Mr. Arroyo going to be speaking with

11  us today?

12          ATTORNEY FOX:  Yes.

13          PRESIDING COMMISSIONER FISHER:  Sir, if

14  you'll raise your right hand, I'll swear you in.

15  Do you solemnly swear or affirm that the

16  testimony you give at this hearing will be the

17  truth and nothing but the truth?

18          INMATE ARROYO:  Yes, I swear.

19          PRESIDING COMMISSIONER FISHER:  All

20  right.  Thank you.  Now, what I'm going to do,

21  Mr. Arroyo, is read a summary of the crime into

22  the record, and then I'm going to ask you to

23  tell me if you agree with what I read, and then

24  we'll (indiscernible).  All right.  Counsel, the

25  probation officer's report or Board report, both

26  are essentially the same.

27          ATTORNEY FOX:  Well, I object to using

Exhibit H 10

11

1  the probation officer's report because it's

2  based on hearsay, but I realize this case went

3  by way of a plea so there may not be another

4  record, and Mr. Arroyo is here to answer

5  questions and clarify.

6      **PRESIDING COMMISSIONER FISHER:**  All

7  right.  We're going to go ahead use the

8  probation officer's report.  It's on page two of

9  the present offense, and it reads as follows:

10      "On September 10, 1979, at

11      approximately 11:00 p.m. Lodi

12      Police Officers were dispatched to

13      the 800 block of South Cherokee

14      Lane in Lodi on the report of an

15      injury accident.  Officers found

16      the victim, 16-year-old Daniel

17      Thomas Martino, slumped over the

18      passenger side of the vehicle he

19      had been driving, and his car was

20      crashed into a parked car.  Victim

21      Martino was pronounced dead on

22      arrival at Lodi Memorial Hospital.

23      For it was determined that he was

24      shot in the head with a shotgun.

25      The passenger, 16-year-old Danny

26      Ramirez, was treated at Lodi

27      Memorial Hospital and was

Exhibit H 11

12

1     released.  Witnesses on the scene

2     reported the victim's car and

3     another vehicle had been racing

4     southbound on Cherokee

5     (indiscernible) each car

6     attempting to hit each other

7     (indiscernible).  After a short

8     distance, a shotgun blast was

9     heard and immediately after the

10    victim's vehicle veered across the

11    street (indiscernible) striking

12    the parked car.  Danny Ramirez

13    testified that Arroyo held a rifle

14    by the shoulder and aimed his gun

15    and leaned forward so that Arroyo

16    could shoot.  He also testified

17    that he and the victim were

18    attempting to leave Lodi when

19    Arroyo and his companions

20    (indiscernible) pursuit

21    (indiscernible) the victim's car

22    with (indiscernible).  At

23    approximately 12:30 a.m.,

24    (indiscernible) with the

25    assistance of officers

26    (indiscernible).  Antonio Lopez

27    Ramirez, Frederico Ashua Gonzales,

*Exhibit H 12*

13

1      aka Tito, (indiscernible)

2      Esperaza, aka Speedy,

3      (indiscernible) aka Chino, and I

4      think, it's Ladie, L-A-D-I-E,

5      Hernandez, (indiscernible).  Mrs.

6      Hernandez was (indiscernible)

7      shortly thereafter when it was

8      determined she had not been

9      present (indiscernible) crime.

10     (indiscernible) suspects

11     (indiscernible) custody

12     (indiscernible) arrested Arroyo in

13     Fresno.  Arroyo insisted that he

14     did not know any of the other

15     suspects nor (indiscernible)

16     however (indiscernible) that he

17     had left town with Hernandez,

18     Gonzales, and Ramirez, and Grazaun

19     the previous evening.  Arroyo

20     changed his story and related the

21     following:  He says that the

22     previous day his brother, Manuel

23     Arroyo, had received a telephone

24     call from some Mexican Americans

25     (indiscernible) area stating they

26     were going to do physical harm to

27     him.  Manuel advised Arroyo of the

Exhibit H 13

14

1       situation and (indiscernible) to

2       get some friends together to meet

3       and (indiscernible).  Arroyo then

4       advised (indiscernible), Ramirez,

5       and (indiscernible) Hernandez of

6       the situation (indiscernible) to

7       Lodi to help.  A minor along with

8       (indiscernible), Ramirez,

9       Gonzales, and Hernandez

10      accompanied Manuel to work that

11      (indiscernible) at approximately

12      10:00 p.m.  After Manuel was

13      dropped off, they proceeded to

14      Clakel Park, that's C-L-A-K-E-L

15      (indiscernible).  After less than

16      an hour (indiscernible) Manuel,

17      I'm sorry, assuming that the two

18      Mexican males (indiscernible) had

19      perhaps (indiscernible) car sped

20      off (indiscernible) passenger

21      seat.  The (indiscernible) pursued

22      the other vehicle with

23      (indiscernible) driving, Arroyo in

24      the passenger seat while the other

25      (indiscernible) in the backseat.

26      They soon found (indiscernible)

27      car did not do so and after a

*Exhibit H 14*

15

```
1          brief (indiscernible) both cars
2          started (indiscernible) at one
3          another.  When this did not work,
4          Arroyo became upset.  He had the
5          shotgun loaded (indiscernible)
6          shotgun at the passenger area of
7          the vehicle.  (indiscernible) of
8          the car.  They observed the car
9          vehicle (indiscernible).  The
10         weapon, a 410 shotgun
11         (indiscernible) of Arroyo's
12         brother, Manuel."
13  All right.  And that completes the summary of
14  the crime.  Is what I read correct?
15         INMATE ARROYO:  No.
16         PRESIDING COMMISSIONER FISHER:  Okay.
17  Tell me what happened.
18         INMATE ARROYO:  It was -- I don't know
19  who did that report, but it wasn't how it
20  happened in order like that.
21         PRESIDING COMMISSIONER FISHER:  Okay.
22  What happened?
23         INMATE ARROYO:  Well, the (indiscernible)
24  we're in the car.  We left my brother in the --
25  he used to work in the fabric.  We give him a
26  ride over there.  At the time, we were drinking
27  and right there when we let my brother out of
```

Exhibit H15

16

1  the work, we were drinking, and one thing led to

2  the other.  I was too drunk inside the car.  As

3  I was driving (indiscernible) the car, he seen

4  the guys pass by (indiscernible) a car, and they

5  happened.  There was a shotgun right there in

6  the car, and I grabbed the shotgun, and I shot

7  this guy.

8          **PRESIDING COMMISSIONER FISHER:**  Okay.

9  Nothing (indiscernible).  You had known these

10  guys at all?

11          **INMATE ARROYO:**  No.  We don't know these

12  guys.

13          **PRESIDING COMMISSIONER FISHER:**  Okay.

14  You drove your brother to work.

15          **INMATE ARROYO:**  Yeah.

16          **PRESIDING COMMISSIONER FISHER:**  And you

17  had been drinking.

18          **INMATE ARROYO:**  Yes.

19          **PRESIDING COMMISSIONER FISHER:**  Okay.

20  All of the names of all the people that I read

21  (indiscernible).

22          **INMATE ARROYO:**  Well I knew -- excuse me.

23  I knew these guys that were with me.

24          **PRESIDING COMMISSIONER FISHER:**  So were

25  all the people that I read about, these

26  different men that were supposed to be with you,

27  were they all with you?

Exhibit H 16

17

1       INMATE ARROYO:  Some of them, not all of

2  them.

3       PRESIDING COMMISSIONER FISHER:  Okay.

4  All right.  Let's see.  I have your brother,

5  Manuel.

6       INMATE ARROYO:  Yes.

7       PRESIDING COMMISSIONER FISHER:  I have

8  Laraza, Ramirez, and Gonzales.  Were they all

9  with you?

10      INMATE ARROYO:  Yes.

11      PRESIDING COMMISSIONER FISHER:  All

12  right.  And you'd known them for a while, right?

13      INMATE ARROYO:  Yes.

14      PRESIDING COMMISSIONER FISHER:  All

15  right.  And Hernandez.

16      INMATE ARROYO:  Yes.

17      PRESIDING COMMISSIONER FISHER:  All

18  right.  Okay.  So your brother needed a ride to

19  work.

20      INMATE ARROYO:  Yes.

21      PRESIDING COMMISSIONER FISHER:  Okay.

22  And all you guys jump in the car, and you take

23  him to work, right?

24      INMATE ARROYO:  Yes.

25      PRESIDING COMMISSIONER FISHER:  Okay.

26  And how long had you been drinking?

27      INMATE ARROYO:  Since six hours before

Exhibit H 17

18

1    that.

2        PRESIDING COMMISSIONER FISHER:  And had

3    your brother said anything about somebody

4    threatening him?

5        INMATE ARROYO:  No.  We just give him a

6    ride to the work, and then I remember somebody

7    say that a car went by, and I was sitting in the

8    car, and this guy got inside the car, and he

9    started driving.  He say, let's go talk to this

10   guy, and --

11       PRESIDING COMMISSIONER FISHER:  The car

12   drove by with the two victims in it.

13       INMATE ARROYO:  Yes.

14       PRESIDING COMMISSIONER FISHER:  And

15   you're sitting in the front or back

16   (indiscernible)?

17       INMATE ARROYO:  I think I was sitting in

18   the front.

19       PRESIDING COMMISSIONER FISHER:  Which car

20   was it that you were sitting in?

21       INMATE ARROYO:  I can't remember who the

22   car belonged to.

23       PRESIDING COMMISSIONER FISHER:  Who was

24   driving the car?

25       INMATE ARROYO:  Bennie Varasa.

26       PRESIDING COMMISSIONER FISHER:

27   (indiscernible), so after you drop your brother

*Exhibit H 18*

19

1   off, were you just sitting around in front of

2   the place that he worked?

3       INMATE ARROYO:  Yes.

4       PRESIDING COMMISSIONER FISHER:  Okay.

5   And Varasa was out of the car at that moment?

6   You said that (indiscernible)?

7       INMATE ARROYO:  Yeah.  Yeah.  He was out

8   of the car.

9       PRESIDING COMMISSIONER FISHER:  All

10  right.  And so this car drives by with these two

11  kids in it, and he jumps in the car and says,

12  let's go talk to them?

13      INMATE ARROYO:  Yeah.  Let's go and talk

14  to these guys.

15      PRESIDING COMMISSIONER FISHER:  Why?

16      INMATE ARROYO:  I think what happened

17  earlier something or day before, they got in an

18  argument or something --

19      PRESIDING COMMISSIONER FISHER:

20  (Indiscernible.)

21      INMATE ARROYO:  My brother, no, my

22  brother, something.

23      PRESIDING COMMISSIONER FISHER:  Okay.

24  All right.  So that's kind of what was said

25  before was that your brother said that somebody

26  had, somebody had threatened him in some way.

27  It says that he said that you said that your

Exhibit H 19

20

1    brother got a phone call from somebody who said

2    that they were going to hurt him.  You don't

3    remember that?

4              INMATE ARROYO:  No.

5              PRESIDING COMMISSIONER FISHER:  Okay.

6    But you think that these guys had gotten into it

7    some kind of argument with your brother the day

8    before, right?

9              INMATE ARROYO:  Yes.

10             PRESIDING COMMISSIONER FISHER:  Okay.

11   How did Varasa know?

12             INMATE ARROYO:  I don't know.

13             PRESIDING COMMISSIONER FISHER:  Was your

14   brother inside work at that time or he

15   (indiscernible)?

16             INMATE ARROYO:  I think he was ready to

17   go inside to work because it was in the front of

18   a park.

19             PRESIDING COMMISSIONER FISHER:  So when

20   you (indiscernible) these two kids

21   (indiscernible) and Varasa jumps in the car and

22   says let's (indiscernible), did your brother go

23   to work or did he get in the car with you?

24             INMATE ARROYO:  No.  He went to work.

25             PRESIDING COMMISSIONER FISHER:  All

26   right.  So you didn't know anything about

27   (indiscernible).

*Exhibit H 20*

21

1       INMATE ARROYO: No. My brother, he

2 didn't know nothing about it.

3       PRESIDING COMMISSIONER FISHER: No. But

4 you, you didn't know anything about these guys

5 that drove by that Varasa wanted to talk to?

6       INMATE ARROYO: I knew that a few days or

7 a day before something happened. They got in an

8 argument or wanted to fight my brother or

9 something like that.

10       PRESIDING COMMISSIONER FISHER: You

11 didn't know what happened (indiscernible)?

12       INMATE ARROYO: No.

13       PRESIDING COMMISSIONER FISHER: Well, let

14 me clarify something real quick here. Were you

15 involved in a gang?

16       INMATE ARROYO: By the time, yeah.

17       PRESIDING COMMISSIONER FISHER: What

18 gang?

19       INMATE ARROYO: Vickitown.

20       PRESIDING COMMISSIONER FISHER: What

21 about the two boys, the two victims? Were they

22 gang members?

23       INMATE ARROYO: I don't know. I don't

24 know.

25       PRESIDING COMMISSIONER FISHER: Did you

26 (indiscernible)?

27       INMATE ARROYO: Excuse me?

*Exhibit H 21*

22

1    PRESIDING COMMISSIONER FISHER:  Did you

2  think they were at the time?

3    INMATE ARROYO:  No.  No, I didn't.

4    PRESIDING COMMISSIONER FISHER:  All

5  right.

6    INMATE ARROYO:  I was drunk at the time.

7    PRESIDING COMMISSIONER FISHER:  Okay.  So

8  you guys decide to go after them to, because

9  Varasa wants to talk to them?

10    INMATE ARROYO:  Yeah.  He say that he

11  wanted to talk to them.

12    PRESIDING COMMISSIONER FISHER:  Okay.  So

13  why would that lead you to take out a shotgun

14  and shoot anybody?

15    INMATE ARROYO:  Well, when the cars they

16  were chasing one another, sticks and pipes were

17  fighting in the back of the seat.

18    PRESIDING COMMISSIONER FISHER:  So they

19  had sticks so you thought you would shoot them?

20    INMATE ARROYO:  I was drunk.  I was drunk

21  at the time.

22    PRESIDING COMMISSIONER FISHER:

23  (Indiscernible.)

24    INMATE ARROYO:  I don't know.  I don't

25  know whose gun was it.

26    PRESIDING COMMISSIONER FISHER:  Who had

27  (indiscernible) shot?

*Exhibit H 22*

23

1          INMATE ARROYO:  I think we went to the

2    house, back to the house.

3          PRESIDING COMMISSIONER FISHER:  And

4    that's where?

5          INMATE ARROYO:  They let me in the house,

6    and they took off.

7          PRESIDING COMMISSIONER FISHER:  They let

8    you in your house?

9          INMATE ARROYO:  Yeah.

10         PRESIDING COMMISSIONER FISHER:  Okay.

11         INMATE ARROYO:  And they took off.

12         PRESIDING COMMISSIONER FISHER:  How old

13   were you when this happened?

14         INMATE ARROYO:  Seventeen.

15         PRESIDING COMMISSIONER FISHER:  All

16   right.  Okay.  And when did you know that Daniel

17   Martino had died?

18         INMATE ARROYO:  When they came in and

19   arrest me.

20         PRESIDING COMMISSIONER FISHER:  All

21   right.  How much had you been drinking?

22         INMATE ARROYO:  I can't really remember

23   that good.

24         PRESIDING COMMISSIONER FISHER:  Had you

25   been drinking all day?

26         INMATE ARROYO:  No, not all day, like off

27   and on that day.

*Exhibit H 23*

24

1        PRESIDING COMMISSIONER FISHER:  But you

2   were drunk.

3        INMATE ARROYO:  Yes.

4        PRESIDING COMMISSIONER FISHER:  All

5   right.  Is there anything else about just the

6   facts of what happened that day that we haven't

7   talked about that you think we should know?

8        INMATE ARROYO:  By the time, I was too

9   young to know what I was doing.  I was angry.

10       PRESIDING COMMISSIONER FISHER:  What were

11  you angry about?

12       INMATE ARROYO:  No.  I wasn't angry.  I

13  wasn't angry at this guy, I was just --

14       PRESIDING COMMISSIONER FISHER:  But you

15  just said you were angry.  What were you angry

16  about?  You said I (indiscernible) I was angry,

17  and I said, what were you angry about?

18       INMATE ARROYO:  I was drunk at the time.

19       PRESIDING COMMISSIONER FISHER:  Do you

20  always get angry when you're drunk?

21       INMATE ARROYO:  No.

22       PRESIDING COMMISSIONER FISHER:  All

23  right.  Anything else about just about the

24  crime, anything that happened that day that we

25  haven't talked about that you think we should

26  know?

27       INMATE ARROYO:  No.  *Exhibit  H  24*

25

1         **PRESIDING COMMISSIONER FISHER:** Let's

2 talk about your life prior to coming to prison

3 for this crime. You have a couple of juvenile

4 arrests. One was for disruptive school

5 activities in 1977, and one was for robbery in

6 1979. What happened with both of those? Did

7 you, were a ward of the Court? Were you on

8 probation?

9         **INMATE ARROYO:** No. I never did time for

10 those.

11         **PRESIDING COMMISSIONER FISHER:** Okay.

12 And then your only adult conviction was for this

13 crime.

14         **INMATE ARROYO:** Yes.

15         **PRESIDING COMMISSIONER FISHER:** Okay.

16 Tell me again, how far did you go in school?

17         **INMATE ARROYO:** Like ninth grade.

18         **PRESIDING COMMISSIONER FISHER:** Ninth

19 grade. Why did you drop out?

20         **INMATE ARROYO:** I was helping my family

21 work like in summer.

22         **PRESIDING COMMISSIONER FISHER:** Okay.

23         **INMATE ARROYO:** I got a big family, five

24 brothers and five sisters.

25         **PRESIDING COMMISSIONER FISHER:** What were

26 you doing for work?

27         **INMATE ARROYO:** I was working in kind of

Exhibit H 25

26

1    like construction or painting contract.

2        PRESIDING COMMISSIONER FISHER:  Okay.

3    All right.  It says in a 2002 psych report that

4    you finished your 11th grade.  That's not right?

5        INMATE ARROYO:  Eleventh, yes.  Oh, in

6    the streets, outside?

7        PRESIDING COMMISSIONER FISHER:  Yes.

8        INMATE ARROYO:  Well, I was in 11th grade,

9    but I didn't complete it.

10        PRESIDING COMMISSIONER FISHER:  You just

11   told me you dropped out in the ninth grade.

12        INMATE ARROYO:  Yeah.  And then I started

13   going to school like off and on, but I didn't

14   complete it.  Yes.

15        PRESIDING COMMISSIONER FISHER:  Okay.

16   All right.  It says that your dad passed away

17   when you were real young; is that right?

18        INMATE ARROYO:  Yes.

19        PRESIDING COMMISSIONER FISHER:  How old

20   were you?  Do you remember?

21        INMATE ARROYO:  Only about one or two

22   years old.

23        PRESIDING COMMISSIONER FISHER:  You were

24   a baby still.  And then your mom remarried.

25        INMATE ARROYO:  Yes.

26        PRESIDING COMMISSIONER FISHER:  You were

27   about 11 it says here; is that right?

*Exhibit H 26*

27

1        INMATE ARROYO:  Yes.

2        PRESIDING COMMISSIONER FISHER:  Okay.  It

3   says that you have two sisters and a brother who

4   were your dad's children, and then you have

5   three stepbrothers and two stepsisters.

6        INMATE ARROYO:  Yes.

7        PRESIDING COMMISSIONER FISHER:

8   (indiscernible) the 2002 report because it has

9   some information here about your family.  It

10  says your mom's still alive at this time.  Is

11  she still alive?

12       INMATE ARROYO:  Yes.

13       PRESIDING COMMISSIONER FISHER:  Okay.

14  And how's she doing?

15       INMATE ARROYO:  She's hanging in there.

16       PRESIDING COMMISSIONER FISHER:  She's

17  still pretty young.  She's not even 70 yet.

18  (Indiscernible.)

19       INMATE ARROYO:  She's in the late 60s.

20       PRESIDING COMMISSIONER FISHER:  What

21  about your brothers and sisters?  Do you have

22  contact with them?

23       INMATE ARROYO:  Yes.

24       PRESIDING COMMISSIONER FISHER:  And how

25  are they doing?

26       INMATE ARROYO:  They're doing okay.  They

27  come and visit me.  We're a close family.

*Exhibit H 27*

28

1          PRESIDING COMMISSIONER FISHER:  Okay.

2   Did anybody else ever go to prison?

3          INMATE ARROYO:  No.

4          PRESIDING COMMISSIONER FISHER:  It says

5   here that you got married once, and that was

6   after you came to prison.  It said after you

7   were incarcerated that you knew her before you

8   committed this crime; is that right?

9          INMATE ARROYO:  Yeah.  That's my

10  daughter's mom.

11         PRESIDING COMMISSIONER FISHER:  Okay.

12  All right.  And how old is your daughter now?

13         INMATE ARROYO:  Twenty-five.

14         PRESIDING COMMISSIONER FISHER:  Are you

15  in contact with her?

16         INMATE ARROYO:  Yes.

17         PRESIDING COMMISSIONER FISHER:  And how

18  is she doing?

19         INMATE ARROYO:  She's doing okay.  I'm a

20  grandparent.

21         PRESIDING COMMISSIONER FISHER:  Are you?

22         INMATE ARROYO:  Yes.

23         PRESIDING COMMISSIONER FISHER:  How many?

24         INMATE ARROYO:  I got two grandkids.

25         PRESIDING COMMISSIONER FISHER:  Boys or

26  girls?

27         INMATE ARROYO:  Kimberly and Mike.

Exhibit H 28

29

1      PRESIDING COMMISSIONER FISHER:  And how

2  old are they?

3      INMATE ARROYO:  Three and one.

4      PRESIDING COMMISSIONER FISHER:  Does she

5  send you pictures?

6      INMATE ARROYO:  Yeah.

7      PRESIDING COMMISSIONER FISHER:

8  (Indiscernible.)

9      INMATE ARROYO:  Yes.  Right on the

10  pictures.

11      PRESIDING COMMISSIONER FISHER:

12  (Indiscernible.)

13      INMATE ARROYO:  Yeah.

14      PRESIDING COMMISSIONER FISHER:  Okay.

15  All right.  What about her mom?  Are you still

16  in contact with her mom?

17      INMATE ARROYO:  Yes.  We still have

18  contact because my daughter, but she remarried,

19  and she's doing her life.

20      PRESIDING COMMISSIONER FISHER:  This was

21  2002.  It said that you were engaged in 2002.

22  Did you get married?

23      INMATE ARROYO:  Yes, I got married.

24      PRESIDING COMMISSIONER FISHER:  Are you

25  still married?

26      INMATE ARROYO:  No.  We're divorced.

27      PRESIDING COMMISSIONER FISHER:  All

*Exhibit H 29*

30

1  right.  Tell me about your history drinking or

2  any drugs because you were drinking that day.

3      INMATE ARROYO:  Yes.

4      PRESIDING COMMISSIONER FISHER:  Did you

5  have a problem with alcohol?

6      INMATE ARROYO:  No.  That day I just, I

7  was just drinking, and I don't know how to

8  control the alcohol.

9      PRESIDING COMMISSIONER FISHER:  All

10  right.

11      INMATE ARROYO:  Alcohol got the best of

12  me.

13      PRESIDING COMMISSIONER FISHER:  All

14  right.  When did you start drinking?  How old

15  were you?

16      INMATE ARROYO:  I think about 17.

17      PRESIDING COMMISSIONER FISHER:  Okay.

18  And how often were you drinking, on the weekends

19  or only once in awhile?

20      INMATE ARROYO:  Maybe like the weekends

21  but not that much.

22      PRESIDING COMMISSIONER FISHER:  Okay.

23  When you, when you were drinking, were

24  (indiscernible)?  Did you get drunk every day?

25      INMATE ARROYO:  Yeah.  The few times that

26  I drink.  Yeah.

27      PRESIDING COMMISSIONER FISHER:  What

*Exhibit H 30*

31

1    about drugs?

2         INMATE ARROYO:  Only did marijuana one

3    time.

4         PRESIDING COMMISSIONER FISHER:

5    (indiscernible) did it again?

6         INMATE ARROYO:  Because I didn't like it.

7         PRESIDING COMMISSIONER FISHER:  Ever try

8    anything else?

9         INMATE ARROYO:  No.

10        PRESIDING COMMISSIONER FISHER:  So if

11   that's the case, why are so many of your 115s

12   related to substance abuse?  Did you get

13   involved with drugs and alcohol after you came

14   to prison?

15        INMATE ARROYO:  No.  I got 115s behind

16   it, but I wasn't using.

17        PRESIDING COMMISSIONER FISHER:  Were you

18   trafficking?

19        INMATE ARROYO:  No.

20        PRESIDING COMMISSIONER FISHER:  What were

21   you doing?

22        INMATE ARROYO:  I just right there and I

23   had them and I got caught.

24        PRESIDING COMMISSIONER FISHER:

25   (indiscernible) have?

26        INMATE ARROYO:  They weren't belong to

27   me, somebody else.

*Exhibit H 31*

32

1      PRESIDING COMMISSIONER FISHER:   So you

2    just always happened to be in the wrong place at

3    the wrong time?

4      INMATE ARROYO:   No.

5      PRESIDING COMMISSIONER FISHER:

6    (Indiscernible.)   There's a lot of them here.

7    We've got -- (indiscernible) back in '80, you've

8    got stimulants and sedatives and possession of

9    marijuana in '89.   You got contraband in '89.

10   You've got possession of controlled substance in

11   '92, possession of heroin in '92, contact

12   extortion conspiring to traffic narcotics in

13   '95, and conspiracy to traffic (indiscernible)

14   in (indiscernible).

15      DEPUTY COMMISSIONER MEJIA:   Just for the

16   record, Commissioner, '96 and the '95 are the

17   same one.   It was (indiscernible).

18      PRESIDING COMMISSIONER FISHER:   Did you

19   (indiscernible) were all those yours?

20      INMATE ARROYO:   No.

21      PRESIDING COMMISSIONER FISHER:   Did you

22   602 them?

23      INMATE ARROYO:   Yeah.   The last one I'm

24   still, I got an appeal 602 because they just got

25   me for some confidential thing.   There was

26   planning to do this and then but I'm still

27   602ing it right now.

*Exhibit H 32*

33

1     **PRESIDING COMMISSIONER FISHER:**  Okay.

2     **INMATE ARROYO:**  But they test me and

3  everything.  I came out clean.  I wasn't using.

4     **PRESIDING COMMISSIONER FISHER:**  Okay.

5  Well, there's (indiscernible).  All right.  I'm

6  actually getting into your post-conviction, so

7  let's move on and talk about your parole plans.

8  Let's see here.  It says here that if you were

9  to receive a parole date that you would live

10  (indiscernible); is that correct?

11     **INMATE ARROYO:**  Yes.

12     **PRESIDING COMMISSIONER FISHER:**  Okay.

13  Are the letters in the file still current

14  (indiscernible) or are they copies

15  (indiscernible)?  I had some letters in his file

16  here.

17     **ATTORNEY FOX:**  These are, these are

18  different, more current, I think mostly.

19     **INMATE ARROYO:**  Yes.

20     **PRESIDING COMMISSIONER FISHER:**  The first

21  letter is in Spanish which I don't read

22  (indiscernible).

23     **INMATE ARROYO:**  Lesa, my daughter, my

24  granddaughter.

25     **PRESIDING COMMISSIONER FISHER:**  Is that

26  offer a residence or a job (indiscernible)?

27  It's just generally a support letter.

*Exhibit  H  33*

34

1          INTERPRETER ZAVALA:  Right.

2          PRESIDING COMMISSIONER FISHER:  General

3    support?

4          INTERPRETER ZAVALA:  Correct.

5          PRESIDING COMMISSIONER FISHER:  Okay.

6    And who's it from?

7          INTERPRETER ZAVALA:  Manuel Arroyo.

8          INMATE ARROYO:  Yes.  My brother.

9          PRESIDING COMMISSIONER FISHER:  Who is

10   that, your brother?

11         INMATE ARROYO:  My older brother.

12         PRESIDING COMMISSIONER FISHER:  Okay.  I

13   have a letter here from Margaret -- I don't know

14   how you pronounce her last name.  It's

15   E-Q-U-I-H-U-A.

16         INMATE ARROYO:  Equihua.

17         PRESIDING COMMISSIONER FISHER:  This is

18   your sister?

19         INMATE ARROYO:  Yes.

20         PRESIDING COMMISSIONER FISHER:  She says,

21   my family (indiscernible) we will help

22   financially until he's stable and

23   (indiscernible).  She talks about her husband's

24   place of work where (indiscernible) body and

25   paint and that you'll be hired also making

26   murals on cars.

27         INMATE ARROYO:  Yes.

*Exhibit H 34*

35

1          PRESIDING COMMISSIONER FISHER:  So are

2   you an artist?

3          INMATE ARROYO:  Yes.

4          PRESIDING COMMISSIONER FISHER:  I have a

5   letter here from Marlia Marlara.

6          INMATE ARROYO:  Marlara.

7          PRESIDING COMMISSIONER FISHER:  Is this

8   your sister also?

9          INMATE ARROYO:  Yes.

10         PRESIDING COMMISSIONER FISHER:  Okay.

11  And she says that you're welcome to live in her

12  home.  She says, I will refer to my employer for

13  (indiscernible) bakery (indiscernible) positions

14  (indiscernible).  She says, I look forward to

15  helping my brother financially and in any other

16  area.  What would you do for the bakery?  Do you

17  know?

18         INMATE ARROYO:  Work in there.

19         PRESIDING COMMISSIONER FISHER:  General

20  labor?

21         INMATE ARROYO:  Yes.

22         PRESIDING COMMISSIONER FISHER:  And then

23  I have one here from Maria -- who is it?

24         ATTORNEY FOX:  Tomas.

25         PRESIDING COMMISSIONER FISHER:  Tomas?

26         ATTORNEY FOX:  Yeah.

27         PRESIDING COMMISSIONER FISHER:  Okay.

*Exhibit H 35*

36

1    This is also a sister.

2        INMATE ARROYO:  Yes.

3        PRESIDING COMMISSIONER FISHER:  She says

4    that you're welcome to live with her.  She

5    (indiscernible) as well.  It says that your

6    talent with drawing is highly admired and that

7    she believes that you'll (indiscernible) find a

8    job using those skills.  I have another letter

9    in Spanish here (indiscernible) from Josephina?

10       INMATE ARROYO:  Yes.  My sister.

11       PRESIDING COMMISSIONER FISHER:

12   (indiscernible) certainly (indiscernible)

13   inventory (indiscernible).  She says that I will

14   be able to support my brother after he's

15   released from prison.  He will live here with me

16   in my home (indiscernible).  And the last one I

17   have is from Gloria Arizan.

18       INMATE ARROYO:  Arizan.  Yes.

19       PRESIDING COMMISSIONER FISHER:  And she

20   says that you've been friends for a few years

21   and (indiscernible).  I'd like you to take into

22   consideration (indiscernible).  She says that

23   you're a good friend, and she will be there for

24   you and be your (indiscernible).

25   (indiscernible) advised or just lend an ear so

26   he can (indiscernible).  Now, you know that

27   there's an INS Hold, right?

Exhibit H 36

37

1          INMATE ARROYO:  Possibly.  Yes.

2          PRESIDING COMMISSIONER FISHER:  No.

3  (Indiscernible.)  Do you have any parole plans

4  at all for Mexico?

5          INMATE ARROYO:  The last time I came to a

6  BPT, they asked me for some letters in Spanish.

7  That's the one that's in there.  It goes

8  together with this one.

9          PRESIDING COMMISSIONER FISHER:  Okay.

10  Well, we have the letters in Spanish, but it's

11  not (indiscernible).  Your sister's in Stockton.

12          ATTORNEY FOX:  There is an offer in

13  Tijuana.

14          PRESIDING COMMISSIONER FISHER:  Is there?

15          ATTORNEY FOX:  Yeah.

16          PRESIDING COMMISSIONER FISHER:  Okay.

17  Are these letters that are in the file still

18  current?

19          ATTORNEY FOX:  Yes.

20          PRESIDING COMMISSIONER FISHER:  All

21  right.  And the (indiscernible).

22          ATTORNEY FOX:  Under notices and

23  responses.

24          PRESIDING COMMISSIONER FISHER:  All

25  right.  Okay.  I have one from Irma Arajo.

26          INMATE ARROYO:  Arajo.  Yes.

27          PRESIDING COMMISSIONER FISHER:  Okay.

*Exhibit H 37*

38

1    This is a friend of yours?

2             INMATE ARROYO:  Yes.

3             PRESIDING COMMISSIONER FISHER:  And she

4    says, she's an interior (indiscernible) or a

5    cook (indiscernible), and she says, I'll be

6    willing to give (indiscernible) programs

7    (indiscernible) support and friendship

8    (indiscernible) filling out applications and

9    resumes and support programs (indiscernible).

10   This is from your sister, Maria Tomas, a letter

11   here (indiscernible) Arroyo Mesa; is that

12   correct?

13            INMATE ARROYO:  Yes.

14            PRESIDING COMMISSIONER FISHER:  Guadalupe

15   (indiscernible), she says, I'm here to, I hereby

16   inform you that Mr. Artemio Arroyo has my

17   (indiscernible) and economic support

18   (indiscernible).  (Indiscernible.)  A letter

19   here from Felipe Arroyo, if you are, he says if

20   he's deported to Mexico (indiscernible) get out

21   of jail that (indiscernible) for you, your

22   cousin.  (indiscernible) pick you up.

23   (indiscernible) but it doesn't say anything

24   about home or in that one.  It says, I have been

25   (indiscernible) Artemio Arroyo (indiscernible)

26   he has a home here if you want and

27   (indiscernible) on my (indiscernible) it's here

Exhibit H 38

39

1   at this home we all will support him and

2   (indiscernible).  All right.  A letter from

3   Clemente Mendez, (indiscernible).   And

4   (indiscernible) family members in the same

5   (indiscernible) Mexican (indiscernible) support

6   him in all aspects that will be necessary when

7   he requires it.  (Indiscernible.)  All right.

8   Is there anything else about parole plans

9   (indiscernible)?  Is there anything else about

10  parole plans that I haven't talked about that we

11  should know?

12       INMATE ARROYO:  No.  I completed small

13  engines.

14       PRESIDING COMMISSIONER FISHER:  Is that

15  what you would want to do for work?

16       INMATE ARROYO:  Yeah.  And air

17  conditioning refrigeration and woodshop.

18       PRESIDING COMMISSIONER FISHER:  Okay.

19       INMATE ARROYO:  I completed those since I

20  been locked up.

21       PRESIDING COMMISSIONER FISHER:  Okay.

22  Now, if you were to go to Mexico,

23  (indiscernible) would you be involved in

24  substance abuse programming, AA or NA or

25  something like that?

26       INMATE ARROYO:  Yes.

27       PRESIDING COMMISSIONER FISHER:  Okay.

*Exhibit H 39*

40

1  Have you looked into that at all?

2          INMATE ARROYO:  Yeah.  I been going to

3  AA.

4          PRESIDING COMMISSIONER FISHER:

5  (Indiscernible.)

6          INMATE ARROYO:  Yes.

7          PRESIDING COMMISSIONER FISHER:  Have you

8  looked into where you would be able to get

9  involved with that on the outside?

10          INMATE ARROYO:  No.  But I would like to

11  get in those programs.

12          PRESIDING COMMISSIONER FISHER:

13  (indiscernible) are available (indiscernible).

14          INMATE ARROYO:  Yes.

15          PRESIDING COMMISSIONER FISHER:  All

16  right.  Is there anything else about any of the

17  things that we've gone over before we move on

18  and talk about your post-conviction performance?

19  (Indiscernible.)

20          INMATE ARROYO:  Yeah.

21          PRESIDING COMMISSIONER FISHER:  All

22  right.  Then if you will turn your attention to

23  Commissioner Mejia, he's going to go through

24  your post-conviction factors with you.

25          DEPUTY COMMISSIONER MEJIA:  Okay.  Mr.

26  Arroyo and counsel, I would be covering these,

27  in this portion of this hearing, his

*Exhibit H 40*

41

1  institutional adjustment since his last Board

2  appearance, and I have reviewed the Central File

3  and Board reports, if you (indiscernible) I'll

4  give you a chance to make comments or make

5  additional information.

6        ATTORNEY FOX:  Thank you.

7        DEPUTY COMMISSIONER MEJIA:  And the last

8  hearing he attended was June 19, 03, or February

9  19th of 2003, where he received a two-year

10 denial.  Recommendations were for him to remain

11 disciplinary-free, participate in self-help, and

12 classification score is 19, custody level is

13 Medium A.  He has a 1992 high school diploma

14 completion and notes two vocations.  Small

15 engine repair he completed in 2002, and air

16 conditioning and refrigeration 1998, and he was

17 saying that he has a wood --

18       INMATE ARROYO:  Yeah.  Carpentry.

19       DEPUTY COMMISSIONER MEJIA:  You have a

20 completion; you have a certificate completion?

21       INMATE ARROYO:  (Indiscernible.)

22       DEPUTY COMMISSIONER MEJIA:  Yeah.

23 Because I didn't see that.  You have it?  Let me

24 see it.  What year was that, Mr. Arroyo?

25       INMATE ARROYO:  It was in like in '82.

26       DEPUTY COMMISSIONER MEJIA:  Oh, '82,

27 okay.  It would be old.  It must be here, but

Exhibit H 41

42

1    let me double check.  In 1982, okay, well, why

2    you guys are looking for that, I'll continue on.

3    I'm going to -- okay.  Anyway, we'll continue

4    on.  So actually, you have three, and you're

5    trying to look for the completion on that.

6         INMATE ARROYO:  Yes.

7         DEPUTY COMMISSIONER MEJIA:  And I see

8    that you have started your AA in 1998?

9         INMATE ARROYO:  Yes.

10        DEPUTY COMMISSIONER MEJIA:  And you're

11   current up to December 30th, 2004.  Are you

12   still attending AA?

13        INMATE ARROYO:  Yes.

14        DEPUTY COMMISSIONER MEJIA:  And you have

15   Impact completion of 14-week self-help in

16   regards for increase awareness and empathy for

17   the survivors of a crime.  This was completed

18   November 17th, 2003.  You have Project Change in

19   2002, although, these are past, before last

20   year.  I'm just putting it in the record.  Anger

21   Management, 1999, and another Anger Management,

22   44-week course, 2002, you have a parenting

23   class, 2000.  Anything else I've missed that you

24   completed in the last two years?

25        INMATE ARROYO:  Breaking Barriers.

26        DEPUTY COMMISSIONER MEJIA:  What year was

27   that?

Exhibit H 42

43

1      INMATE ARROYO:  I believe it was '91.

2      DEPUTY COMMISSIONER MEJIA:  Okay.  In '91

3  is included once before.  The most recent --

4      INMATE ARROYO:  Before?

5      DEPUTY COMMISSIONER MEJIA:  Yeah.  I'm

6  just looking at the two years for now, but I

7  included some that are close to the last, the

8  last three years.

9      INMATE ARROYO:  Okay.

10     DEPUTY COMMISSIONER MEJIA:  Anything

11  between 2003 and today?

12     INMATE ARROYO:  I was close to completing

13  machine shop, but they closed machine shop in

14  North.

15     DEPUTY COMMISSIONER MEJIA:  Didn't you

16  get a completion in small engine?  Oh, you were

17  doing machine shop also?

18     INMATE ARROYO:  Yeah.  I was doing

19  machine shop, but they closed the shop.

20     DEPUTY COMMISSIONER MEJIA:  Okay.  What

21  is your current work assignment?

22     INMATE ARROYO:  Excuse me?

23     DEPUTY COMMISSIONER MEJIA:  What is your

24  current work assignment?

25     INMATE ARROYO:  I was in landscaping, but

26  they moved me from North to Central.

27     DEPUTY COMMISSIONER MEJIA:  What is your

*Exhibit H 43*

44

1    work assignment right now?

2        INMATE ARROYO:  Right now, I'm in the

3    waiting list.

4        DEPUTY COMMISSIONER MEJIA:  Okay.  All

5    right.  Okay.  And you have actually suffered or

6    incurred 14 disciplinaries or CDC 115s from

7    1980, the last being in December in 1995, and

8    you have 10 128(a)s from 1983 and the last being

9    in 1995.

10        INMATE ARROYO:  Twenty-eights?  Excuse

11    me, 28 days, eight days?

12        DEPUTY COMMISSIONER MEJIA:  128(a)s, that

13    is the counseling chronos.  You have 10 of them

14    from 1983 to 1993.

15        ATTORNEY FOX:  Mr. Zavala, could you

16    explain that.  I don't think Mr. Arroyo

17    understood what the 128(a) counseling chrono is.

18        INMATE ARROYO:  I wasn't going to work?

19        DEPUTY COMMISSIONER MEJIA:  No.  These

20    are documentations for behavior.  You had ten of

21    them since 1983, the last being in 1995.  These

22    are what you call the counseling custodial

23    counseling chronos.  These are not 115s.

24        INMATE ARROYO:  Oh.  Okay.

25        DEPUTY COMMISSIONER MEJIA:  You get

26    copies of that every time you get issued that.

27        INMATE ARROYO:  I can't remember having

*Exhibit H 44*

1  those.  I know the 115s, but --

2       DEPUTY COMMISSIONER MEJIA:  You don't

3  remember you have 128s?

4       INMATE ARROYO:  I know I had a few of

5  them but not that many.

6       DEPUTY COMMISSIONER MEJIA:  Not ten?

7       INMATE ARROYO:  No.

8       ATTORNEY FOX:  I came up with ten as well

9  with the last being in 1995.

10       DEPUTY COMMISSIONER MEJIA:  Okay.

11       ATTORNEY FOX:  That's what I counted when

12  I reviewed his Central File.

13       DEPUTY COMMISSIONER MEJIA:  You don't

14  remember this, these documents?

15       INMATE ARROYO:  Yeah.

16       DEPUTY COMMISSIONER MEJIA:  Sir, I

17  counted ten.  All right.  And 14 115s, the last

18  being in 1995.  And I would like to, just like

19  to double back on the -- you're saying that your

20  last 1995 appeal is still on appeal?  I don't

21  think that's possible.  They already made a

22  decision to give you a motion of granting of

23  your appeal, they reissued and reheard it, and

24  that's why there is a September 6, 1996,

25  document of that that we heard it, the 1995

26  because of that appeal.  There's no more appeal

27  going.  It's not on appeal anymore.  It's over.

Exhibit H 45

46

1          **INMATE ARROYO:**  I was still trying to
2    fight in the Courts.

3          **DEPUTY COMMISSIONER MEJIA:**  By the
4    Courts, okay.

5          **ATTORNEY FOX:**  Yeah.  It's in the Courts.

6          **DEPUTY COMMISSIONER MEJIA:**  Okay.  I was
7    thinking about the CDC.  I'm sorry.  Your gang
8    affiliation is Vickitown member.

9          **INMATE ARROYO:**  I was, not no more.

10          **DEPUTY COMMISSIONER MEJIA:**  Okay.

11          **INMATE ARROYO:**  When I was younger.

12          **DEPUTY COMMISSIONER MEJIA:**  And the
13    psychiatric report, let me read your psychiatric
14    report.

15          **ATTORNEY FOX:**  It's the new one.

16          **DEPUTY COMMISSIONER MEJIA:**  I know.  I
17    don't know where I placed it.  Maybe I could
18    borrow yours.  This is dated June 9th, 2005, by
19    Dr. Steward, spelled as S as in Sam, T as in Tom
20    E-W-A-R-D as in David, clinical psychologist at
21    CTF,

22              "And Diagnostic Impression Axis I,
23              Poly-substance Abuse in
24              Institutional Remission; Axis II,
25              Antisocial Personality Disorder;
26              Axis III, None; Axis IV,
27              Incarceration; Axis V, GAF of 80.

*Exhibit H 46*

47

1   At the time of the interview
2   there's no evidence of thought or
3   mood disorder, (indiscernible)
4   suicidal or homicidal ideation.
5   Arroyo's insight and judgment are
6   fair to good with adequate impulse
7   control.  Assessment of
8   dangerousness, inmate does not
9   have a violent criminal history
10  prior to this offense.  He does
11  not have any violent CDC 115
12  violations within the prison
13  system; therefore, it's concluded
14  that the violence potential within
15  a controlled setting is estimated
16  to be average to below average
17  relative to other inmates.  If
18  release to the community, Inmate
19  Arroyo's potential for violence is
20  estimated to be above average,
21  about, I'm sorry, strike that,
22  about average, about average as
23  compared to the average citizen in
24  the community.  The reason for
25  this is his greater maturity as
26  indicated by him not receiving a
27  CDC 115 --"

*Exhibit H 47*

1    **ATTORNEY FOX:**  The tape just went off, so

2    he's going to change it.

3        [Thereupon, the tape was turned over.]

4        **DEPUTY COMMISSIONER MEJIA:**

5    (indiscernible) of this report, I'm doing the

6    psychiatric evaluation.

7        "If released to the community,

8        Inmate Arroyo's potential for

9        violation, violence, is estimated

10       to be about average as compared to

11       the average citizen in the

12       community.  The reason for this is

13       his greater maturity as indicated

14       by him not receiving CDC 115s

15       within the last 10 years and his

16       apparently responsible behavior at

17       work.  Prior psychological

18       evaluations have documented all

19       the substance abuse and concerns

20       and the CDC 115s indicate he was

21       still involved in such ten years

22       ago.  On the day of the incident,

23       he was heavily intoxicated from

24       drinking approximately seven

25       beers; therefore, there is a

26       significant risk factor.  Inmate

27       Arroyo has a greater probability

Exhibit H 48

```
 1          of violence if he continues to
 2          abuse alcohol or illegal drugs.
 3          The potential for violence would
 4          be considered much higher than the
 5          average citizen in the community
 6          if he abuses substances.  Inmate
 7          Arroyo is confident and
 8          responsible for his behavior.  He
 9          has the capacity to abide by
10          institutional standards.  Inmate
11          Arroyo does not have a mental
12          health disorder which would
13          necessitate treatment either
14          during the incarceration period or
15          following parole.  If Arroyo is
16          paroled, the following strong
17          recommendations, the following are
18          strongly recommended, abstinence
19          from all illegal drugs and
20          alcohol, monitoring substance
21          abuse, mandatory attendance of
22          self-help groups that address his
23          substance abuse."
24   Any additions or comments, counselor?
25          ATTORNEY FOX:  Not on the psychological
26   evaluation, but I do have a Case Number
27   regarding the pending appeal if that's an issue
```

Exhibit H 49

50

1  regarding the 115s.

2          DEPUTY COMMISSIONER MEJIA:   That's fine.

3          ATTORNEY FOX:   Okay.   It's in the Ninth

4  Circuit.

5          DEPUTY COMMISSIONER MEJIA:   It's on

6  record.

7          ATTORNEY FOX:   Okay.

8          DEPUTY COMMISSIONER MEJIA:   Okay.

9          ATTORNEY FOX:   That's all.  Thank you.

10          DEPUTY COMMISSIONER MEJIA:   Let me return

11  this back to the Chair.

12          PRESIDING COMMISSIONER FISHER:   Thank

13  you.  Can you clarify for me and for the record

14  what (indiscernible)?

15          DEPUTY COMMISSIONER MEJIA:   Do you want

16  me to do that?

17          PRESIDING COMMISSIONER FISHER:   Yeah.

18  Either one of you.

19          DEPUTY COMMISSIONER MEJIA:   You know

20  where.

21          ATTORNEY FOX:   I believe it's the last

22  two, the '95 and '96 that were --

23          DEPUTY COMMISSIONER MEJIA:   Yeah.

24  They're in the same exactly, the one that's on

25  December 15, 1995; that's the actual date of the

26  offense.

27          ATTORNEY FOX:   Right.   Right.  And that's

*Exhibit H 50*

51

1  subject of the appeal.  It's my understanding.

2        PRESIDING COMMISSIONER FISHER:  Okay.

3  When did you start AA or NA?  What year did you

4  start either of those?

5        INMATE ARROYO:  It must have been '89.

6        PRESIDING COMMISSIONER FISHER:  Was it

7  after your 115 for possession of controlled

8  substance?

9        INMATE ARROYO:  No.  That was before

10 that.

11       PRESIDING COMMISSIONER FISHER:  You

12 started one before that?

13       INMATE ARROYO:  Yes.

14       PRESIDING COMMISSIONER FISHER:  All

15 right.  So, sir if I can (indiscernible) are you

16 saying that all of these 115s that you have for

17 substance abuse are not correct, that none those

18 drugs were yours?

19       INMATE ARROYO:  Yes.  They weren't mine,

20 but I had them in my possession.

21       PRESIDING COMMISSIONER FISHER:  Why did

22 you have them in your possession?

23       INMATE ARROYO:  I just had them.  I don't

24 remember.

25       PRESIDING COMMISSIONER FISHER:  You don't

26 remember why you had them?

27       INMATE ARROYO:  No.

52

1        PRESIDING COMMISSIONER FISHER:  Does that
2   make sense to you?  Do you think that makes
3   sense to me?
4        INMATE ARROYO:  I was just holding them,
5   and I had them in my possession, and I got
6   caught, and they write me up.
7        PRESIDING COMMISSIONER FISHER:  So what,
8   one of your friends come up to you on the yard
9   and say, hey, will you hold my drugs for me?  Do
10  you say, yeah, okay?
11       INMATE ARROYO:  Some of the times, I
12  don't know they were there.
13       PRESIDING COMMISSIONER FISHER:  How would
14  you not know they were there?
15       INMATE ARROYO:  Until later, they caught
16  me with that, and they write me up.
17       PRESIDING COMMISSIONER FISHER:  All
18  right.  I'm not going to ask anymore questions
19  if you're not answering them.  So you started,
20  you say you think you started substance abuse
21  programming in '89; is that right?
22       INMATE ARROYO:  Yes.
23       PRESIDING COMMISSIONER FISHER:  Okay.
24  One has to assume that since you were innocent
25  of all these 115s the substance abuse
26  programming was working, right?
27       INMATE ARROYO:  It was, it was working.

1  I was -- I have those things with me, and I got

2  caught, but I wasn't using them.  I learned by

3  my mistakes.

4       PRESIDING COMMISSIONER FISHER:  Were you

5  selling them?

6       INMATE ARROYO:  No.

7       PRESIDING COMMISSIONER FISHER:  Were you

8  trading them?

9       INMATE ARROYO:  They were for somebody

10  else.

11       PRESIDING COMMISSIONER FISHER:  All

12  right.  I'm not going to beat a dead horse.  Do

13  you have any questions, Commissioner?

14       DEPUTY COMMISSIONER MEJIA:  Yeah.  Whose

15  shotgun was the shotgun that was used in the

16  crime?

17       INMATE ARROYO:  Who was it?

18       DEPUTY COMMISSIONER MEJIA:  Who owns it?

19       INMATE ARROYO:  I don't know.  I don't

20  know whose, who that shotgun belonged to.

21       DEPUTY COMMISSIONER MEJIA:  Did it come

22  from your home, your residence?  It belongs to

23  your brother?

24       INMATE ARROYO:  No.  They find it in my

25  brother's house, but it didn't belong to him.

26       DEPUTY COMMISSIONER MEJIA:  Okay.  How do

27  you feel about the victim?

54

1      **INMATE ARROYO:** I feel bad. I feel

2  remorse. I don't think I hate that guy. I was

3  young at the time. I committed a crime, and I'm

4  paying for it. I'm responsible for the murder.

5      **DEPUTY COMMISSIONER MEJIA:** No other

6  questions.

7      **PRESIDING COMMISSIONER FISHER:** Okay.

8  (Indiscernible.) What do you know about the

9  victim, anything?

10      **INMATE ARROYO:** No.

11      **PRESIDING COMMISSIONER FISHER:** Let me

12  ask you a question this way. You've got in a

13  lot of trouble. You got a lot of stuff that you

14  don't know anything about. You didn't know the

15  victim. You didn't know about the situation

16  with your brother. You didn't know whose

17  shotgun it was. You didn't know anything about

18  why you happened to get caught with these drugs

19  that weren't yours after you'd started NA and

20  AA. Has anything changed about the way you make

21  decisions?

22      **INMATE ARROYO:** Yeah. Now, I changed.

23  Before I do something, I got to know what it is,

24  so if somebody tell me to hold this for me, I

25  got to know what it is first.

26      **PRESIDING COMMISSIONER FISHER:** I see.

27  Anything else?

55

1          INMATE ARROYO:   If you asking me who they

2     belong to --

3          PRESIDING COMMISSIONER FISHER:   No.   I'm

4     not asking you that.   I'm asking you, I'm asking

5     you if you're -- apparently you're not, in the

6     past starting with the commitment offense and

7     your prior behavior coming to the commitment

8     offense, you weren't making very good decisions.

9     You weren't using very good judgment.

10         INMATE ARROYO:   Yes.

11         PRESIDING COMMISSIONER FISHER:   If indeed

12    you just didn't know anything about any of this

13    stuff, you were just, you were just apparently

14    along for the ride on all this stuff; what do

15    you do differently now, not just related to

16    holding somebody's drugs for them and not

17    needing to know what it is; what do you do in

18    general in your life that's different from the

19    way you make it seem?

20         INMATE ARROYO:   I learned something new

21    everyday.   Now, I learn a lot of things that

22    before I do something, think twice, and I won't

23    make the same mistakes I make in the past.

24         PRESIDING COMMISSIONER FISHER:   Do you

25    have any questions, Commissioner?

26         DEPUTY COMMISSIONER MEJIA:   No.   I'm done

27    Thank you.

1        **PRESIDING COMMISSIONER FISHER:**  Counsel?

2        **ATTORNEY FOX:**  No, no questions.

3        **PRESIDING COMMISSIONER FISHER:**  All

4    right.  Do you want to close?

5        **ATTORNEY FOX:**  Yes.  Thank you,

6    Commissioners.  Mr. Arroyo would have you find

7    him suitable for parole based primarily on his

8    lack of any disciplinary problems over the last

9    ten or so years.  The crime of commitment, he

10   feels remorseful for and expresses that remorse

11   in the words available to him.  He's not been

12   over the last decade a management problem.

13   There was what could be characterized as a

14   lengthy period of adjustment learning how to fit

15   into the Department of Corrections, but he's

16   done very well over the last ten years and has

17   completed several self-help programs including

18   Impact.  The psychological evaluation is

19   supportive stating that he has a Global

20   Assessment Functioning of 80 which is very high

21   among the population of the prison.  Turning to

22   parole plans, Mr. Arroyo has two sets of viable

23   parole plans, one in the county of commitment

24   with both a place to live and employment as well

25   as skills he's learned that can take him beyond

26   just the offer of employment.  Turning to the

27   offer in Mexico, he has family there who is

57

1   willing and able to support him, and it spoke in

2   the letter saying they'd like to meet him at the

3   border.  So Mr. Arroyo would have you find him

4   suitable.  He's not the impulsive young man he

5   was and has learned a number of skills which

6   have evidenced themselves over the past ten

7   years which would portend a successful

8   completion and discharge from parole once he

9   gets out.  So I'll submit based on that unless

10  there are comments that Mr. Arroyo would like to

11  make.

12       PRESIDING COMMISSIONER FISHER:  Anything

13  you'd like to add, Mr. Arroyo to what your

14  attorney said on your behalf?

15       INMATE ARROYO:  No.

16       PRESIDING COMMISSIONER FISHER:  Okay.

17  Before we recess, let me, I just want to put

18  something on the record that I neglected to do.

19  Commissioner, is there any confidential to be

20  considered today?

21       DEPUTY COMMISSIONER MEJIA:  Today?

22  There's some confidential information.

23       PRESIDING COMMISSIONER FISHER:  Okay.

24       DEPUTY COMMISSIONER MEJIA:  But I don't

25  think we need to consider anything.

26       PRESIDING COMMISSIONER FISHER:  Okay.

27       DEPUTY COMMISSIONER MEJIA:  It's not

58

1   going to be used today.

2           **PRESIDING COMMISSIONER FISHER:**  All

3   right.  I also, I don't know if we addressed the

4   issue the fact that we had some letters of

5   opposition that were not received in a timely

6   manner.  I wasn't going to consider them and

7   (indiscernible).

8           **ATTORNEY FOX:**  I didn't get them.

9           **DEPUTY COMMISSIONER MEJIA:**  I gave you

10  the letter.

11          **ATTORNEY FOX:**  I have one which I would

12  have.

13          **PRESIDING COMMISSIONER FISHER:**  We just

14  received them.  One came in (indiscernible).

15  All right.  So we're going to go ahead recess to

16  deliberate.

17          **ATTORNEY FOX:**  Thank you.

18                  **R E C E S S**

19                  --oOo--

20

21

22

23

24

25

26

27

59

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER MEJIA:  We're back on

4    record for our decision in Mr. Arroyo's matter.

5    PRESIDING COMMISSIONER FISHER:  All

6    right.  I want to note for the record that

7    everyone who was previously in the room and

8    identified themselves has returned to the room.

9    Mr. Arroyo, the Panel reviewed all information

10    received from the public and relied on the

11    following circumstances in concluding that

12    you're not yet suitable for parole and would

13    pose an unreasonable risk of danger to society

14    or a threat to public safety if released from

15    prison.  Clearly, the first thing that was

16    considered was the commitment offense.  This was

17    the murder of Daniel Martino, who was 16 years

18    old.  I'm not entirely sure why it wasn't the

19    attempted murder of the other person in the car.

20    This was a situation where Mr. Arroyo and his

21    crime partners were gang members.  According to

22    Mr. Arroyo, he's not quite sure why they took

23    off after the victim's car.  He thinks that it

24    may have had something to do with an argument

25    that his brother had with the victim and his

26    friends that prior day.  It sure looks like a

27    ARTEMIO ARROYO C-20149 DECISION PAGE 1    7/12/05

60

1   gang-related crime.  The victims were chased by

2   Mr. Arroyo and his crime partners in a situation

3   that must have been pretty interesting to watch.

4   Apparently, the two cars full of people were

5   trying to attack each other with sticks as they

6   drove down the street at which point Mr. Arroyo

7   picked up a loaded shotgun and fired at the

8   victim's car.  In the probation officer's

9   report, it says that he thought he hit both of

10  them in the victim's car and that he observed

11  the car veer to the left and crash into a parked

12  vehicle.  And in discussing the crime today with

13  Mr. Arroyo, he didn't, he indicated he really

14  didn't know the victim.  He didn't know whose

15  gun it was.  He didn't know whose car it was.

16  He wasn't quite sure why his crime partner

17  wanted to go talk to them, and yet, with none of

18  the information available to him or with no

19  interest in getting information, he picked up a

20  loaded shotgun and shot at the teenaged boys

21  killing one of them.  Certainly, based on the

22  information from the Statement of Facts, this

23  crime was callous.  It was clear there were

24  multiple victims, and the crime was carried out

25  in a manner that demonstrates an exceptionally

26  callous disregard for human suffering, and the

27  ARTEMIO ARROYO C-20149 DECISION PAGE 2   7/12/05

61

1  motive for this crime was, I don't know, almost

2  nonexistent.  He was drunk, and he was mad.  It

3  does not show what he was mad about, but he

4  didn't know the victims, and he didn't know

5  anything about the argument with his brother.

6  Mr. Arroyo does have certainly an unstable

7  social history.  He was involved in a gang.  He

8  was involved in substance abuse.  He talked

9  about dropping out in ninth grade.  Apparently,

10  he attempted to go back to school a few times,

11  but he never was able to complete another grade

12  after that.  He does have a juvenile record of

13  arrests; although, all it shows in the

14  disposition here, petition requested, and he

15  said that he didn't serve any time

16  (indiscernible) activity (indiscernible) for

17  robbery.  Mr. Arroyo is (indiscernible)

18  incarcerated.  He did, he has participated in AA

19  and NA (indiscernible).  He also participated in

20  Impact programs (indiscernible) 2003, but he's

21  not yet sufficiently participated in beneficial

22  self-help, and in fact, I think it's important

23  to note, once again, is what was mentioned

24  during the hearing that at a time during which

25  he says that he was participating in NA and AA,

26  he was continuing to receive 115 that were

27  ARTEMIO ARROYO C-20149 DECISION PAGE 3    7/12/05

62

1    substance related.   He has had ten 128

2    counseling chronos.   The last one was in 1995.

3    That was for inappropriate behavior during a

4    visit.  He's had 15 115 disciplinary reports.

5    The last one was in 1996, and that was related

6    to trafficking narcotics.   And as a matter of

7    fact, he has been, he has been placed in special

8    housing as a result of his multiple 115s.   The

9    last time was in December of 1995, and that was

10   for conspiracy to traffic narcotics that

11   (indiscernible) a nine-month SHU term at that

12   time.  He does have parole plans.  He does seem

13   to have good family support.  He doesn't have,

14   he does have two job offers, both in Mexico and

15   in California.  The Panel finds the prisoner

16   needs to participate in self-help in order to

17   understand, cope with stress in a nondestructive

18   manner in order to (indiscernible) related to

19   his substance abuse issues that have been

20   ongoing (indiscernible) since 1996 in order to

21   gain insight into the commitment offense

22   (indiscernible) and the impact of his behavior

23   on other people including the victims of his

24   crime.  Certainly, his gains are recent, and he

25   needs to demonstrate ability to maintain his

26   gains over an extended period of time, and that

27   ARTEMIO ARROYO C-20149 DECISION PAGE 4    7/12/05

63

1   would be in relation to substance abuse issues.

2   Once again, he has a 115 for trafficking

3   narcotics (indiscernible) 1996.  Considering the

4   fact that he was drunk at the time of the

5   commitment offense and he continued to rack up

6   115s related to those after he already started

7   substance abuse programming, we certainly need

8   to see a longer time of being disciplinary-free

9   and of continuing to program in a substance

10  abuse program.  And given his (indiscernible)

11  history and his lack of program participation,

12  there's no indication that he would behave

13  differently if paroled.  We do want to commend

14  you, Mr. Arroyo, for being in AA and NA.

15  Hopefully, it's starting to make a difference

16  now; also, for participating in the Impact

17  program.  I know that's a 44-week program.  It's

18  quite an intense program.  However, currently,

19  the positive aspects of behavior do not outweigh

20  the factors of unsuitability.  In a separate

21  decision the Hearing Panel finds that the

22  prisoner has been convicted of murder, and it's

23  not reasonable to expect that parole would be

24  granted at a hearing during the following two

25  years.  The specific reasons for this finding

26  are, first of all, the commitment offense.  Once

27  ARTEMIO ARROYO C-20149 DECISION PAGE 5   7/12/05

64

1   again, this was the murder of a 16-year-old boy

2   who Mr. Arroyo claims he didn't know and that he

3   didn't have an issue with.  There were multiple

4   victims in this crime.  Mr. Martino's companion

5   was in the car while Mr. Arroyo was shooting at

6   it.  Certainly, the offense was carried out in a

7   manner that demonstrates a callous disregard for

8   human suffering, and once again, the motive for

9   this crime was inexplicable.  Mr. Arroyo isn't

10  sure why he was shooting at them and says that

11  it was not, that he didn't know him, didn't know

12  about (indiscernible) with the brother, and it

13  wasn't gang related.  He does have a prior

14  record of criminal behavior; although, all of

15  the (indiscernible) couple of arrests as

16  juvenile, it doesn't show any convictions in his

17  file, but he does have a history of unstable

18  relationships that relate to his substance

19  abuse, to his gang affiliation, to his criminal

20  behavior, and to the fact that he's a high

21  school dropout.  The prisoner has not completed

22  the required programming that is essential to

23  his adjustment.  He needs additional time to

24  gain that programming.  (indiscernible) area of

25  self-help and what we recommend to you, Mr.

26  Arroyo, is that you remain disciplinary-free,

27  ARTEMIO ARROYO C-20149 DECISION PAGE 6    7/12/05

65

1   that you continue to participate in substance

2   abuse programming, and that you get involved in

3   any kind of programs that you can that will help

4   you gain some insight into your behavior.  If

5   you can't do it through education, you need to

6   work on it on your own.  You can get books.  You

7   can get tapes.  You can do it however you want

8   to do it on your own.  Independent study, you

9   can do that.  Bring back a report to the Board

10  and tell me what you've learned.  I have to tell

11  you that you didn't strike me as being

12  particularly truthful.  You are constantly,

13  apparently, getting in trouble for things that

14  you don't know why you have them in your

15  possession; that you don't have anything to do

16  with.  You didn't know anything about anything

17  related to why you were in the car with these

18  guys chasing Mr. Martino and his friend.  You

19  didn't know whose shotgun it was.  You weren't

20  even sure why you shot him other than that you

21  were drunk and mad.  And when I ask you what you

22  were angry about, you said you weren't angry.

23  So you need to do a little bit of work on what

24  your motivations are and the things that you do

25  and maybe come to some conclusions about what

26  part of responsibility you want to take for your

27  ARTEMIO ARROYO C-20149 DECISION PAGE 7   7/12/05

66

1    own behavior, and that completes the reading of

2    the decision.  Do you have any comments,

3    Commissioner?

4         DEPUTY COMMISSIONER MEJIA:  Yes.  I

5    concur with what you said, Commissioner.  I just

6    want to clarify that you were able to get the

7    certificate.

8         ATTORNEY FOX:  No.

9         DEPUTY COMMISSIONER MEJIA:  If it's in

10   his cell, he can bring it for, you know, bring

11   it to his counselor so that it will be in the

12   file for his next hearing.

13        ATTORNEY FOX:  The cabinetry one?

14        DEPUTY COMMISSIONER MEJIA:  Yeah.  We

15   would appreciate that.

16        ATTORNEY FOX:  All right.

17        DEPUTY COMMISSIONER MEJIA:  Thank you.

18        PRESIDING COMMISSIONER FISHER:  Thank

19   you.  That concludes the hearing.

20                   --oOo--

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON:_____NOV - 9 2005___

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   ARTEMIO ARROYO C-20149 DECISION PAGE 8    7/12/05

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, KRISTIN LEDBETTER, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do

hereby declare and certify under penalty of

perjury that I have transcribed tape(s) which

total one in number and cover a total of pages

numbered 1 - 66, and which recording was duly

recorded at CORRECTIONAL TRAINING FACILITY,

SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF

ARTEMIO ARROYO, CDC NO. C-20149, ON JULY 12,

2005 and that the foregoing pages constitute a

true, complete, and accurate transcription of

the aforementioned tape to the best of my

ability.

I hereby certify that I am a

disinterested party in the above-mentioned

matter and have no interest in the outcome of

the hearing.

Dated JULY 19, 2005, at Sacramento,

California.


KRISTIN LEDBETTER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**